Good morning, Your Honors. Mary E. Broadhurst appearing on behalf of defendants, appellants, parents of R.J. And I wish to reserve five minutes and I will watch the time. Courts have routinely utilized a three-step test for determining whether reimbursement for private placement should be granted to parents, whether the district is offered a free or appropriate public education, whether the placement selected by the parents is appropriate, and whether there are any equitable factors which would reduce or limit the award of reimbursement. That third step is not a factor which has been raised by the district in any step of this proceeding. The district court in this instance- As I understand it, the ALJ denied reimbursement for Mount Batchelor Academy, so we're only really talking about the Copper Canyon Academy, is that- That's correct. Correct, all right. Absolutely. In May of 2006, a due process hearing was requested. It alleged issues going back for the full two years of statute of limitations. That is the first instance of the district court's error in this case, in that the district court only dealt with the December 2005 IEP, finding that the earlier IEPs were no longer at issue because the school district had developed a new IEP. We believe this to be wrong for several reasons. Number one, the IDEA clearly has a two-year statute of limitations. At that point, the State of Oregon had a two-year statute of limitations, which had been decided by the Ninth Circuit Court of Appeals on a case, the Sherwood v. S.V. case. Therefore, the entire two years should have been before the district court and not just the last IEP from December 25th forward. To what extent, with respect to the IEPs, do we take into account the fact that teachers by and large said that R.J. was doing well, was a good student? Well, I think the fact that R.J. continued to have behavioral issues in the school setting that were a result of her ADHD, the fact that her ADHD was what qualified her for services under the IDEA, and when she first came to the district, they noted that she had social skill deficits. They were very concerned about the social skill deficits, and yet the social skills, any instruction regarding social skills did not appear on this child's IEP until December 2005. We have ---- But wasn't the school district addressing the ADHD problems, and really what caused the parents' need or feeling that they needed a residential placement was her defiance at home and her inappropriate relationship with a custodian? The district was not dealing with the social concerns as a result of the ADHD. At the IEP meeting in October of 2005, they referred the parents to community resources and basically said it was not an educational issue. This is for a student who they understood had some serious social concerns on their own testing that they did of her when she came to the district, and yet for four and a half years did not address social skills in any way on her IEP. She did see a counselor during her freshman year through the school district. Where does the record support the idea that they didn't consider her ADHD in their IEPs? The IEPs themselves do not include a single social objective or goal addressing social skills. It's not there. They don't address it until December of 2005. They do have her seeing a counselor for 30 minutes a week in her freshman year. That counselor was not even aware that the child was eligible for services because she had ADHD. That counselor had no idea that the student had ADHD. So they did not address it until their proposed IEP in December of 2005, in spite of the fact that their own evaluator, when she came into the district in 2007, said that this child had some significant issues, particularly in the area of peer relationships and assertion. This is a student who was unable to assert herself at all with peers, and the problems that she encountered as she entered the high school arena of dating and sexuality were tremendous because she was not in any way prepared to have her own self-identity. And the district did not, basically the district's response was, look elsewhere. We're not the agency to which these kinds of issues are taken. Well, that's certainly one view of what would have happened there. But when you read the IEP, they talk about difficulty with distractibility. They talk about completing assignments, following instructions, being truthful with adults, impairing her ability to work to the best of her ability to be responsible for her social interactions. Absolutely, Your Honor. I did not mean to indicate that they were not addressing the organizational needs that arose from the ADHD, but they did not address the social needs that arose from her ADHD. The IEPs in this case... Well, I guess my worry is that when I read the IEP, I had a tough time suggesting that what you're saying is true. I mean, we're talking about social conflicts outside the school. We're talking about her safety, her ability to make responsible choices. We're talking about her lying to her teachers and her parents. We're talking about also her weak organizational skills and the way she does her assignments. But I guess I'm... And we also talk about to be responsible in her social interactions. But there were no goals in addressing the social interaction. What you were just looking at is what's called the present level of performance. The present level of performance is supposed to be a present level of performance. And I believe that's one of the issues in this case, is that the school district failed to have adequate present level of performances that really told us where this child was at in the very examples that you just cited, how was she performing in those areas. The next step is to develop an annual goal. Well, and I saw the goals, and the goals are related to what the school has suggested that they can do in those kind of situations. Which were all organizational type, but not behavioral. I see. This may, in fact, turn on the... There's a case that was mentioned, the County of San Diego case. And Judge Banner, in this instance, assuming arguendo, he stated that the district, the Ninth Circuit Court of Appeals, decided that case correctly. He felt that this case should not be followed as the County of San Diego case. And he gave two reasons. One was a funding reason. And it makes little matter that the state of Oregon funds the IDEA differently than the state of California. In California, when a student requires residential treatment, the state mental health agency pays. In the state of Oregon, there's a legislature... The legislature passes a bill each year authorizing a set amount of money to assist school districts with that. But the fact that the funding happens separately or differently should not affect this case. The... I want to go back to the other part in the Clovis case. I'm sorry, in the County of San Diego case. The second way the district court attempted to distinguish that case was regarding the specific behaviors. And the County of San Diego case defined the term educational needs. The educational needs definition does not change. That remains the same. The fact that the child did not display the same behaviors in the exact way or to the same extent does not change the meaning of the term's educational term, educational needs, which has been determined to be inclusive of not only academics, but school behavior and socialization. Who supported the idea that she needed residential placement other than the parents or the mother and the operators of the school? Your Honor, in this case, at hearing and throughout this case, we did not argue that at any time this child required residential placement. If we go back to the steps to determine whether or not reimbursement is determined to be appropriate, one is did the school district offer free appropriate public education? In this case, they did not. The parent is unable at that point to, and she did ask the district to please deal with her daughter's emotional needs, but she's not able to go out and find other placements in the community that, other than residential, that would be funded by the school district. So basically, she turns to this residential placement. Once she's at the residential placement, she gets an evaluation, the child does, and this is at MBA, and an independent evaluator said that, yes, she needed to be in a residential placement, but we do not feel that we need to prove that residential is necessary in this case. We believe what we need to show is that the school district did not develop properly the IEPs, that they did not have the elements required by law, and that those violations resulted in a failure to provide a free and appropriate public education. The next step is, were the parents' placement appropriate? The ALJ held MBA was not. That has not been appealed. Copper Canyon Academy, however, is an appropriate placement. The record supports that. I think there are many ways in which a district court can do that. The student was at home instruction for some time while she was waiting to get a psychological evaluation that arguably the school district should have been providing since this child had exhibited some behaviors in the school setting that caused concern. Those included sticking pins in her arm during a math class. The parent had pulled her until she had some resolution of that in a psychological evaluation, and the district agreed to provide some tutoring at that point. But that tutoring was not addressing the social and emotional needs. It was purely academic tutoring. Now, the seminal issue of ADHD, the court displays a total disregard of the idea that the ADHD was a disability which affected RJ or that ADHD actually exists. It summarily dismissed the ALJ's finding that RJ is acting without thought to consequences and engaging in risky behaviors was related to the ADHD and opined that, quote, using that criteria, a substantial part of teenage population of America suffers from the same disability. Thus, under the district court's analysis, solely because some teenagers without ADHD can have behaviors similar to RJ, then one must conclude either that a substantial part of American teenagers have ADHD or that RJ does not. And this reasoning on this record defies logic. There are findings of fact, very clear findings of fact, that her behaviors were related to the ADHD. It, in fact, is the reason why the district decided that she needed services in the first place. Counsel, you're down to less than three minutes. Just to alert you. Thank you. Thank you very much. So you're basically saying the district court didn't recognize the ADHD, but the school district did but didn't recognize it appropriately? That's correct. They recognized the ADHD and offered services to deal with the organizational, the turning in of homework and time management and bringing the appropriate books to class. But they did not deal with her social skills. And when you look back at the- Yeah, but what I'm getting at is they recognized it. Do you feel they didn't deal with it appropriately while you're saying the district judge totally dismissed ADHD altogether? From my reading of the district court's opinion, the district court had some serious concerns as to whether ADHD was a disability and that if her behaviors were the result of her ADHD, then a significant population has the same disability. And I think when you have clear findings on the record that attribute her behavior to the disability, the court is bound by those and can only overturn those findings if they're for clear error. He does not do that. Instead, he just comes to his own conclusions. I'm going to reserve the remaining minute and a half. You may do so, counsel. We'll hear from the school district. Yes. Nancy Hungerford on behalf of the Ashland School District. I want to go back to the question about standard review to begin and say that unless this Court can find that the district court abused its discretion, you must let this decision stand. In this particular case, I don't think there's any doubt about the fact that the district court clearly considered the findings of fact that the ALJ came to and chose to disregard them because they were not clear and thorough. And the court itself provides 28 pages of renewed findings. In fact, it goes through and develops a complete set of facts about the situation. What's more, Judge Panner goes through and just tells you why the determination of the ALJ is not clear and thorough. He talks about omissions, really significant omissions, about the fact that this student had good academic performance in the semester that she was withdrawn up until about Thanksgiving time, and that's when she found out because she had jumped out of the window at home and gone to see a boy at night. And her mother said, you're out of the house. I'm not going to have anything to do with you. She knew her mother was looking at residential placement. She had to go to the home of her father. She had a poor relationship with an alcoholic stepmother in that home, with a new stepbrother. Her performance goes into a tailspin at that point, but not until as of the first quarter of that year in November. She's passing all of her classes. She's getting good grades. There is not an evidence of a behavioral issue here at school. And insofar as there were organizational needs and problems with turning in papers, the school was addressing that. That's clearly part of the IEP. And the evidence that she was doing okay academically, her grade point was about 2.6 or so at the point when she withdrew, so that's about a C plus or a B minus grade point average, shows that what the school was doing was adequate to address the effects of ADHD in an educational setting. Now, the whole question about whether she needed social goals, you have to look to see, was the absence of social goals creating problems in the educational setting at school. There's one instance where she put some pins in her arm, and that was months and months before she was withdrawn. It was in February, and she wasn't withdrawn until December. There are no confirmed facts that show that she had any problems with any other students at school. These alleged behaviors that she later creates in some of her fictitious accounts, which Judge Panner indicates he finds very little credibility and he explains why. All of the other accusations are about behaviors that are going on outside in the community. And even the ALJ had to work very hard to find any kind of behavioral social issue that impacted the education at school. He admits that, although much of this occurred away from school on weekends and at nights, it still impacted her ability to gain educational benefit. We don't see that in the academic records, certainly in her ability to profit from the educational component. It says, the ALJ says she became engaged in self-destructive behaviors such as cutting and sticking pins in the arm, sometimes during class. Again, one instance, months earlier, didn't happen again. That's how far he has to stretch, to reach, to find any behavioral component. So we maintain that when Judge Panner found that the district at all times had a fape in place, that that decision should not be reversed by this Court. He explained why he concluded that the behavior, that the program that they offered was an adequate program. She was being provided with counseling. The ALJ says, well, it wasn't the right kind of counseling. The counselors, you know, should have been talking to her more about her dating behaviors and more about her behaviors with these boys. But the counselors were providing the services that would help her with her educational progress, and they even did address some of those other issues, but they're not obligated to do so under the law. What about counsel's argument that the Judge Panner poo-pooed, for want of a better  word, that she was identified as other health-impaired because of ADHD? First of all, he adopts facts that acknowledge that she was identified as other health-impaired because of ADHD. The fact that he made some statements that other teenagers evidence the same kinds of behaviors indicate that there are multiple reasons why students might engage in those behaviors. ADHD could be one of them. But I think that the point that he really goes to when he addresses the ADHD is, is to say that the school district did have an appropriate program in place to address the educational issues, that the issues that are outside of the school's control, her sexual behavior was the precipitating factor, and there's no doubt about that. The mother acknowledged that in her testimony. It was the last straw when she went out the bedroom window. And that was the reason why she ended up being placed in this other program. The fact that it happened to be a residential program and there wasn't another program, even by counsel's own interpretation that she needed social goals, those were offered before the parent withdrew her. When the school heard that the parent was looking at putting her in this residential placement, even though I think there is an adequate IEP at all times, they agreed to add these social goals. So on what basis can she claim that there is a right to the compensation of the reimbursement? The threshold issue here is, was there a fake? Because if there was a fake in place, then it doesn't matter, the rest of it. There is no right, there is no ability to ask for reimbursement. Judge Panner found that there was a fake at all times. He did enunciate the reasoning for that. And I do not find that his one paragraph constitutes a poo-pooing of ADHD or an unwillingness to consider the consequences. He may use a little colorful language there, but I don't think if you look at the decision as a whole that he's coming to the conclusion that there was no obligation for the district to address the effects of ADHD. I think instead what he is saying is that the district did address the effects of ADHD insofar as they had an educational impact and they were able to do that. If the current IEP is adequate and appropriate, does it make any difference that previous ones were inadequate? We would maintain not, particularly when you have the passage of time, because you're looking back and the hearings officer looked back to the IEPs that were in place in 2003, 2004, during her middle school career. She had a change of school. She's in the high school now. I think that the question about whether her parents are justified in putting her in another program and asking the school district to pay for it, that has to be looked at in terms of what were the conditions at the time they made that decision. So it's almost immaterial as to whether there was a adequate program when you go back into her middle school career. What's really pertinent is, was there a program in place as she's in this high school year where she's having these accelerating problems outside of the school? I want to just comment on a few other things mentioned by opposing counsel. Let me ask you a little question before you go on. I thought you worked through. What is the case law that I could look at which would, in fact, lead me to the same conclusion you have made about that particular situation? About the fact that the school district, what if the school district had an adequate IEP or adequate FAPE at the appropriate time, and now that would excuse prior? Well, I think that you almost have to look at all of the decisions where the court has ever found reimbursement is entitlement. And that's where you would get to looking at the equitable factors. I think it would certainly be an equitable factor as to whether, you know, the problem with the school district's program was at the time or whether there was a problem, you know, years earlier. So that's one of the places where I would see you would find that in the case law. But I would point you, I think, to a fairly recent decision which the Ninth Circuit reached in August, which didn't make its way into our briefing, Mercer Island School District. And that one definitely addresses the issue of what is the FAPE and clarifies the Ninth Circuit's position that in order to have meaningful, to take meaningful advantage of the opening of the schoolhouse doors to disabled students, there has to be a provision of some educational benefit. I don't think there's any doubt that this student was benefiting by the work she was doing with the learning specialist, the daily interaction she had to help her organize, get her assignments in on time. The fact that her teachers were providing accommodations, those are all part of her IEP, and they were allowing her to be successful. So I think if you look at the Mercer Island decision and you look at the criteria, but you can also look at a couple of other things. For instance, in Mercer Island, the Ninth Circuit reversed on and refused to consider a black mark against the IEP, the fact that it wasn't written technically correctly. It didn't, for instance, specify how many minutes per week. And the district court had said, well, that's a flaw in the IEP, and therefore, we're going to reverse on that. The Ninth Circuit didn't find that to be a fatal flaw. In other words, they evidenced a degree of tolerance in terms of how the format is going to be, which I think you see echoed in Judge Panner's decisions, that there isn't a magical formulation here. What's critical is can you look at the services that the district's providing and say that those are assisting the student in making education, taking educational benefit from the placement. So that would be one of the best places, I think, to go. Roberts. Roberts. Counsel, before you leave the courtroom, would you please make three copies of that citation? Okay. Give it to the deputy clerk and also provide opposing counsel with a copy. Thank you very much. Well, I didn't mean to interrupt your next argument. I just really believe that's a significant issue in this particular case, and that's why I wanted a particular foundation for it. I've done some research myself, but I didn't mean to interrupt your argument. Well, if I have a little additional time, there were just a few other points I wanted to make. You've got a few more minutes. There was the question about who said that the student needed residential placement and a reference made to this evaluator who evaluated her once she ended up at Mount Bachelor Academy. That evaluator saw her for the total sum of one hour and didn't contact any of the school authorities where she had gone to school in Ashland, didn't review school records in their entirety, barely had a conversation with the people at Mount Bachelor Academy, actually. So to give any credence to that opinion, I think opposing counsel has acknowledged that there's no one else that would have to say that said she needed to be in a residential program. So from that standpoint, you know, I think we're back to the question of was there a FAPE that was in place. Panner reasonably decided that there was. His decision there was not an abuse of discretion. Therefore, we believe that that should be maintained. And I think I will conclude. Thank you, counsel. Ms. Broadhurst, you have some reserve time. Thank you. Thank you, Your Honor. First, regarding technical flaws in the IEP, the courts that have interpreted how to determine whether or not a school district has offered a student a free and appropriate public education have been clear that the technical flaws must result in a loss of educational opportunity to the student. And we argue that that did happen in this case. The district court's handling of the ALJ's finding of fact resulted in a faulty opinion. The district court is to review the fact finder's factual determinations for clear error. Each of the ALJ's finding of facts included a citation to the record. The district has not argued that any specific finding of facts were clearly erroneous. The district court did not find that any of the finding of facts were clearly erroneous. It merely found that, in its opinion, it omitted or misstated some important facts. But it did not say which facts it referred to. If the current IEP is appropriate, what difference does it make that the prior ones weren't? We are not asserting that the current IEP is appropriate. But even if the court were to find that, this ALJ found that it was because the school district had not addressed the social skills for the two-year time period at issue, that the child's issues were allowed to grow without any corresponding ability to deal with those social issues. Let's assume that's the case, but if the current IEP then deals with those exacerbated conditions, what's the problem? You want the current IEP allowed for one hour a week. I'm asking you to assume the current IEP addresses them. There would still be an issue of compensatory education. That child would have been denied for two years. You can't remedy a mistake by saying, you know, you've got two years of education that you denied, and then all of a sudden you say, okay, well, we're going to do it right now, and you don't forget about those two years of denial of a free appropriate. How do you compensate for those two years? I'm sorry? How do you compensate for those two years? In this case, the ALJ found it appropriate to award the reimbursement for the residential placement, finding that she needed to have her social skills addressed in that manner. Thank you, counsel. Your time has expired. It's counting the wrong way. Once the red light comes on, that's overtime. The case just argued will be submitted for decision, and the Court will adjourn.
judges: Whyte, O'scannlain, Smith M.